# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

KATHRYN M. MASCH
       **Plaintiff,**

    **v.**                         **Case No. 05-C-625**

JO ANNE B. BARNHART
**Commissioner of the Social Security Administration**
       **Defendant.**

---

## DECISION AND ORDER

Plaintiff Kathryn Masch applied for social security disability benefits, claiming that she was unable to work due to liver disease, degenerative disc disease, osteoarthritis, diabetes, obesity, pain, fatigue, and depression. The Social Security Administration ("SSA") denied her claim initially and on reconsideration, as did an Administrative Law Judge ("ALJ") after a hearing. The Social Security Appeals Council then denied plaintiff's request for review, making the ALJ's decision the final decision of the SSA. See Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005). Plaintiff now seeks judicial review of the ALJ's decision. See 42 U.S.C. § 405(g).

## I.  APPLICABLE LEGAL STANDARDS

### A.  Disability Standard

The SSA has adopted a sequential five-step test for determining whether the claimant is disabled. Under this test, the ALJ must determine:

    (1)      Whether the claimant is currently working;

(2)    If not, whether the claimant has a severe impairment;[1]

(3)    If so, whether the claimant's impairment meets or equals one of the impairments listed in SSA regulations as being presumptively disabling;[2]

(4)    If not, whether the claimant retains the residual functional capacity ("RFC") to  perform her past relevant work; and

(5)    If not, whether the claimant can make the adjustment to other work.

Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

An affirmative answer at any step leads either to the next step, or, at steps three and five, to a finding that the claimant is disabled.  A negative answer at any point, other than step three, ends the inquiry and leads to a determination that the claimant is not disabled. The claimant carries the burden of producing evidence at steps one through four, but if she reaches step five, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy.  Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001).  The SSA may carry this burden by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of her limitations, or through the use of the "Medical-Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education and work experience.  Elbert v. Barnhart, 335 F. Supp. 2d 892, 895 (E.D. Wis. 2004).  However, the ALJ may not rely on the Grid to deny

---

[1]An impairment is "severe" if it significantly limits the claimant's "physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c); 1521(a).

[2]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").

2

a claim if the claimant's attributes do not correspond precisely to a particular rule, or if non-exertional limitations (e.g., pain, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work.  In such a case, the ALJ must solicit the testimony of a VE,  although she may use the Grid as a "framework" for making a decision. Samuel v. Barnhart, 295 F. Supp. 2d 926, 929 (E.D. Wis. 2003).

## B.     Standard of Review of ALJ's Decision

The district court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence" and consistent with applicable law.  Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000).  In determining whether substantial evidence exists, the district court must review the entire record, taking into account both evidence in support of a conclusion and anything that fairly detracts from its weight, Young v. Sec'y of Health & Human Servs., 957 F.2d 386, 388-89 (7th Cir. 1992), but it may not re-weigh the evidence or substitute its judgment for that of the ALJ, Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000).  Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ.  Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).

If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings.   Id.  The ALJ commits such an error if she fails to comply with the SSA's regulations and rulings.  Lopez-Navarro v. Barnhart, 207 F. Supp. 2d 870, 878 (E.D. Wis. 2002) (citing Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991)).  The ALJ's decision must also demonstrate the path of her

3

reasoning, and the evidence must lead logically to her conclusion.  <u>Rohan v. Chater</u>, 98

F.3d 966, 971 (7th Cir. 1996).  While the ALJ need not discuss every piece of evidence in

the record, she must address the important evidence and provide at least a glimpse into

her reasoning.  <u>Zurawski</u>, 245 F.3d at 889.

## II.  FACTS AND BACKGROUND

### A.    Plaintiff's Evidence

At the time of the hearing before the ALJ, plaintiff was 51 years old, 5'6" tall and

weighed 285 pounds.  (Tr. at 299.)  She stated that she had last worked as a courier,[3] and

that she stopped because she was "slowing down [and] just couldn't do it anymore."  (Tr.

at 300.)

Plaintiff testified that she constantly experienced pain in her lower back and right

side, between her bra strap and waist.  She also stated that she had trouble grasping

things with her right (dominant) hand and that her knees hurt due to arthritis.  (Tr. at 301;

310-11.)  She stated that her knees had given out, and she had fallen down the stairs a

few times.  She also stated that she had pain in her ankle, elbow and wrist joints all the

time.  She said that she relieved her pain with medication, hot showers and baths, and

Lidocaine patches, and that she also took insulin for her diabetes. (Tr. 302-03.)  Plaintiff

testified that she was not receiving psychiatric treatment but did take medication for

depression.  She also stated that she had regular crying episodes and withdrew from

people.  (Tr. at 301, 310.)

---

[3]The record indicates that prior to working as a driver/courier plaintiff was employed
as an aide at an assisted living center and as a cashier.  (Tr. at 59.)

4

Plaintiff testified that on a typical day she watched television and visited her daughter and grandchildren, who lived half a block away. She stated that she was able to bathe and dress herself (Tr. at 304) but needed help getting out of the tub (Tr. at 302). She testified that she could cook small meals, sometimes wash dishes, and dust once in awhile, but could not do laundry or yard work. She stated that she used a cane when she walked long distances or where there was nothing to hold onto. She testified that she could not lift her grandchild, who weighed 22 pounds. She stated that she drove but only short distances, and that she had a handicapped parking pass for her car. (Tr. at 305-08.) She said that she got lost while driving, became fatigued, and considered giving her license up because of "black floaters" in her field of vision. (Tr. at 310; 316-17.)

Plaintiff's daughter Rebecca, a registered nurse, completed an activities questionnaire for the SSA, in which she indicated that plaintiff had become very depressed, gained weight, cried frequently, and rarely went out. (Tr. at 96-97.) She stated that plaintiff could not walk far before her legs bothered her, and that plaintiff never did yard work, could not move anything heavy, and became very short of breath after exertion. (Tr. at 98-100.) In a separate questionnaire, plaintiff's other daughter, Randi, indicated that plaintiff isolated herself, rarely went anywhere, and had little interest in activities. (Tr. at 135-37.) She wrote that plaintiff easily got lost when driving, could not stand in one spot for long when cooking, could do little walking without discomfort, and could not finish cleaning due to pain and fatigue. (Tr. at 138.) She stated that plaintiff lost her balance easily and had fallen down the stairs. (Tr. at 139.)

Plaintiff received medical treatment for her conditions at Froedert Hospital and the Medical College of Wisconsin, primarily from nurse practitioner Leann Walker and Dr. Gary

Kolesari. In October 2001, she was seen complaining of back pain with radiculation down her leg, and an x-ray revealed mild to moderate multi-level degenerative disc disease with degenerative facet disease extending from L4 through S1. (Tr. at 187.) On January 21, 2002, plaintiff was seen complaining of right flank pain and given Vicodin. (Tr. at 181.) Lab work showed high cholesterol, triglycerides, and creatinine. (Tr. at 182-83.) In February 2002, she underwent a sonogram, which revealed normal kidneys and a fatty liver. (Tr. at 180.)

Plaintiff had additional lab work done on August 26, 2002, which again revealed elevated creatinine levels. (Tr. at 173.) On August 28, plaintiff called her doctor and stated that she was having problems with her blood sugar. (Tr. at 176.) On September 4, she underwent a CT scan of the abdomen related to her complaint of right upper quadrant pain and elevated liver enzymes, which revealed mild hepatomegaly[4] with diffuse fatty infiltration of the liver. (Tr. at 148.)

On January 16, 2003, plaintiff underwent another abdominal scan following continued complaints of right flank pain, but the scan was normal. (Tr. at 170.) Lab work from February 27 revealed elevated glucose, calcium, and uric acid. (Tr. at 213.) Plaintiff was also seen on that date by NP Walker, who noted that plaintiff was depressed, unable to get up and perform her daily activities, and felt very fatigued. (Tr. at 215.)

In March 2003, plaintiff was seen for post herpetic neuralgia[5] and back pain. X-rays taken on March 29 revealed scattered osteophytic degenerative changes at the cervico-

---

[4]"Enlargement of the liver." Stedman's Medical Dictionary 810 (27th ed. 2000).

[5]This appears to refer to pain after a bout of shingles. See Stedman's Medical Dictionary 814, 1206 (27th ed. 2000).

6

thoracic junction and minimal L3 through L5 osteophytic spurring. (Tr. at 219; 222.) Plaintif returned on April 11 for follow up on her shingles pain and was noted to have an irregular heartbeat and out of control blood sugars. Plaintiff was given a Lidoderm patch for her shingles, which did not provide relief, and later provided Vicodin. (Tr. at 227, 229.)

On April 24, 2003, NP Walker completed a report in which she indicated that plaintiff suffered from chronic pain, fatigue, and parasthesia, and that her symptoms were severe enough to interfere with attention and concentration necessary to perform simple work tasks. During an eight hour workday, she opined that plaintiff could sit, stand, or walk less than one hour, could do none of these activities continuously, and could not complete an eight hour workday without lying down. She indicated that plaintiff could occasionally lift up to 20 pounds but never more. She stated that plaintiff could not tightly grasp with her right hand or regularly use foot controls. She also stated that plaintiff could never work above shoulder level, twist, squat, or climb, and could only occasionally bend at the waist. (Tr. at 207-08.)[6]

Plaintiff returned to NP Walker on July 15, 2003, for a refill of her medications. She also reported that her blood sugars were out of control, and she wanted to try insulin. She complained of continued right side pain. (Tr. at 236.) Later in the month she was prescribed Oxycontin. (Tr. at 238.)[7]

_____

[6]At the hearing, plaintiff testified that she had discussed NP Walker's assessment with Dr. Colesari, and he agreed with it. (Tr. at 309.)

[7]After the matter was appealed to the Appeals Council, plaintiff submitted a letter and RFC assessment from Dr. Kolesari. (Tr. at 251.) Dr. Kolesari indicated that due to insurance limitations plaintiff was unable to obtain psychiatric treatment, so her mental condition was monitored at Froedert. He further indicated that she is "unable to work [and] will be unable to do so for the foreseeable future." (Tr. at 252.) In the RFC assessment,

B.     **SSA Consultants**

Plaintiff was evaluated by several physicians at the behest of the SSA. On November 20, 2002, Dr. Mary Nunchuk met with plaintiff and assessed her condition. (Tr. at 155.) Dr. Nunchuk noted plaintiff to be visibly depressed and tearful at times. (Tr. at 157.) Her diagnosis was major depression, single episode, non-psychotic, moderate. Her prognosis was "extremely guarded given the fact that we do not know the severity of her current liver problem nor its ideology [sic]." (Tr. at 158.)

On December 5, 2002, a state agency consultant, Dr. Jack Spear, reviewed plaintiff's file and completed a psychiatric review technique form and mental RFC assessment. Dr. Spear evaluated plaintiff under Listing 12.04, Affective Disorders, and listed a diagnosis of major depression, single episode, moderate. (Tr. at 192, 195.) On the RFC form, Dr. Spear found that plaintiff was moderately limited in the ability to understand, remember and carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, complete a normal workday without interruptions from psychological symptoms, interact appropriately with the general public, respond appropriately to supervisors, and respond appropriately to changes in a work setting. He found that she was not significantly limited in the other listed areas. (Tr. at 188-89.) He concluded that she was "capable of simple, routine work." (Tr. at 190.) These reports were reviewed and affirmed by another consultant in April 2003. (Tr. at 190.)

---

he imposed severe restrictions inconsistent with an ability to do even sedentary work. (Tr. at 253-56.) Although technically a part of the administrative record, the additional evidence submitted to the Appeals Council cannot serve as a basis for a finding of reversible error in the ALJ's decision. Rice v. Barnhart, 384 F.3d 363, 366 n.2 (7th Cir. 2004).

8

**C.     VE's Testimony**

The ALJ called a VE to assist her in evaluating this evidence and asked a series of hypothetical questions.  The first assumed a person 51 years old, with a 12th grade education and unskilled or semi-skilled work history, limited to medium work of an unskilled, routine, repetitive nature.  The VE opined that such a person could perform plaintiff's past work, which he classified as medium exertionally.  The second question added postural limitations of only occasional stooping, crouching and balancing, and no kneeling, crawling or climbing.  The VE opined that the person could still perform plaintiff's past work.  The third question added a limitation to light work, which according to the VE eliminated plaintiff's past jobs.  However, the VE testified that there were other jobs available at the light level: attendant/monitor (3500 positions in the greater Milwaukee area), inspector (1200 positions), and packager (1000).  The final question added a requirement that the person be able to alternate between sitting and standing, and the VE opined that this limitation would eliminate the attendant/monitor jobs and reduce the inspection jobs to 700 and the packager jobs to 600.  (Tr. at 312-14.)

**D.     ALJ's Decision**

Following the five-step procedure, the ALJ determined that plaintiff was not working, that she had severe impairments including degenerative disc disease, osteoarthritis, osteophyte spurring, flank pain, chronic liver disease, post herpetic neuralgia, and obesity, but that none met or equaled a Listed impairment.  She found that plaintiff's depression was not severe.  In light of these impairments, she found that plaintiff retained the RFC for

9

light work (lifting 10 pounds frequently and 20 pounds occasionally, and standing/walking and sitting six out of eight hours), with the ability to perform unskilled work and additional non-exertional limitations of no climbing, kneeling or crawling, and only occasional stooping, crouching and balancing. At step four, she found that plaintiff could not perform her past work. Finally, relying on the testimony of the VE in response to the third hypothetical and using Grid Rule 202.15 as a framework, she determined at step five that there were a significant number of other jobs plaintiff could perform. (Tr. at 18-20.)

### III. DISCUSSION

Plaintiff argues that the ALJ erred in (1) assessing the credibility of her testimony; (2) considering the effects of, and questioning the VE about, her obesity and ability to ambulate; (3) finding her depression not severe; and (4) evaluating the report of her treating nurse practitioner.

**A.     ALJ's Credibility Determination**

**1.       Legal Standard**

Generally, the court must defer to the ALJ's credibility determination because she had the opportunity to personally observe the claimant's demeanor at the hearing. Windus v. Barnhart, 345 F. Supp. 2d 928, 945 (E.D. Wis. 2004). Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003). "However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994). Further, the ALJ must comply with SSR 96-7p in evaluating credibility.

10

<u>Lopez v. Barnhart</u>, 336 F.3d 535, 539-40 (7th Cir. 2003); <u>Brindisi v. Barnhart</u>, 315 F.3d 783, 787 (7th Cir. 2003).

SSR 96-7p establishes a two-step process for evaluating the credibility of the claimant's testimony about symptoms such as pain, fatigue or weakness. <u>Blom v. Barnhart</u>, 363 F. Supp. 2d 1041, 1054 (E.D. Wis. 2005). First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. If not, the symptoms cannot be found to affect the claimant's ability to do basic work activities. <u>Id.</u> (citing SSR 96-7p).

Second, if an impairment that could reasonably produce the claimant's pain or other symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to perform basic work activities. If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. <u>Id.</u> (citing SSR 96-7p).

At step two, "the ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." <u>Knight v. Chater</u>, 55 F.3d 309, 314 (7th Cir. 1995). Rather, this is but one factor to consider, along with:

(a) the claimant's daily activities;

(b) the location, duration, frequency and intensity of the pain;

(c) precipitating and aggravating factors;

11

(d) type, dosage, effectiveness and side effects of medication;

(e) treatment other than medication;

(f) any measures the claimant has used to relieve the pain or other symptoms; and,

(g) functional limitations and restrictions.

Id. (citing 20 C.F.R. § 404.1529(c)(3)); see also SSR 96-7p.

While SSR 96-7p and § 404.1529 do not require the ALJ to analyze and elaborate on each of the seven factors when making a credibility determination, the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning. Blom, 363 F. Supp. 2d at 1055. In this regard, SSR 96-7p requires the ALJ's decision to include "'specific reasons for the finding on credibility, supported by the evidence in the case record.'" Id. (quoting SSR 96-7p). "[T]he reasons for a credibility finding may [not] be implied. Indeed, the cases make clear that the ALJ must specify the reasons for [her] finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003).

### 2. Analysis

The ALJ found that plaintiff's allegations of disabling pain were not supported by the evidence and were not credible. (Tr. at 16, 19 #4.) The ALJ acknowledged the evidence of spinal abnormalities but found that the records failed to show any exertional limitations based on those abnormalities. (Tr. at 16.) She further noted that plaintiff's pain complaints were treated by a combination of medications and topical agents for relief, with no side effects, and that plaintiff was receiving no treatment for her liver condition or the "black

12

floaters" in her eyes. (Tr. at 16-17.) With respect to plaintiff's testimony regarding problems with her feet and use of a cane, the ALJ noted that the clinical findings did not suggest significant and persistent disorganization of motor functions of the extremities. (Tr. at 17.)

The ALJ concluded that while plaintiff testified that her daily activities were fairly limited, two factors weighed against her testimony. First, those limitations could not "be objectively verified with any reasonable degree of certainty." (Tr. at 17.) Second, "even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the medical evidence and other factors discussed in this decision." (Tr. at 17.)

Despite the deference due the ALJ's finding on credibility, I cannot find this analysis sufficient. It appears that the ALJ did find that plaintiff had an impairment that could reasonably produce pain or other symptoms. Thus, she was required to evaluate the intensity and limiting effects of plaintiff's symptoms.

The ALJ considered most of the seven factors set forth in § 404.1529(c)(3)and SSR 96-7p, including plaintiff's daily activities, her use of and the side effects from her medication, and treatment and other measures plaintiff used to relieve her pain. However, I find several significant flaws in her analysis. First, she relied substantially on the absence of objective medical findings supporting plaintiff's testimony. Once a plaintiff has shown that she suffers from an impairment that could produce pain or other symptoms, she need not fully substantiate her testimony with medical evidence. See Knight, 55 F.3d at 314; Blom, 363 F. Supp. 2d at 1054.

13

Second, the ALJ stated that plaintiff's testimony about her limited daily activities could not "be objectively verified with any reasonable degree of certainty." (Tr. at 17.) Setting aside whether such objective verification was necessary, cf. Kllokoqi v. Gonzales, No. 03-3508, 2005 U.S. App. LEXIS 27071, at *16 (7th Cir. Dec. 12, 2005) (discussing limited circumstances in which corroborative evidence is necessary in administrative adjudicatory proceeding),[8] the ALJ ignored corroborating evidence in the record. Plaintiff's daughters, one of whom is a nurse, filed statements in which they indicated that plaintiff was depressed, cried frequently, and rarely went out; that plaintiff could not walk far, never did yard work, could not move anything heavy, and became very short of breath after exertion; that plaintiff easily got lost when driving, could not stand in one spot for long, and could not finish cleaning due to pain and fatigue. Plaintiff's daughter Randi corroborated plaintiff's testimony that she lost her balance easily and had fallen down the stairs. While the ALJ need not comment on every piece of evidence in the record, she cannot ignore important evidence that directly contradicts one of her findings. Zurawski, 245 F.3d at 888; Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000); Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995); Herron, 19 F.3d at 333; Taylor v. Schweiker, 739 F.2d 1240, 1243 (7th Cir. 1984); Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982); Elbert, 335 F. Supp. 2d at 913.[9]

_____

[8]It is clear that the ALJ cannot require objective medical evidence to corroborate plaintiff's statements about her pain or other symptoms. Pope v. Shalala, 998 F.2d 473, 482 (7th Cir. 1993), overruled on other grounds by Johnson v. Apfel, 189 F.3d 561 (7th Cir. 1999).

[9]It is true that the Seventh Circuit has held that the ALJ need not explicitly discuss testimony redundant of the claimant's. Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993). However, the present case is distinguishable because the evidence the ALJ

14

Finally, the ALJ opined that plaintiff's limitations may not be due to her medical conditions, "as opposed to other reasons." (Tr. at 17.) However, she failed to explain what she meant by this statement. The ALJ must adequately explain her rationale in order to permit informed review. See SSR 96-7p (stating that ALJ's evaluation of credibility must contain "specific reasons" and "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight"). She failed to do so in the present case.

Therefore, because the ALJ violated SSR 96-7p, ignored important evidence, and failed to adequately explain her conclusion, the decision on credibility must be reversed and the matter remanded for re-evaluation of plaintiff's testimony in light of the entire record.

## B.    Consideration of Plaintiff's Obesity

### 1.    Legal Standard

Obesity is a complex, chronic disease characterized by excessive accumulation of body fat and is generally the result of a combination of factors (e.g., genetic, environmental, and behavioral). SSR 02-1p at 2. Obesity often, though not invariably, leads to other health problems such as cardiovascular disease, diabetes, sleep apnea, and depression. Id. Treatment is often unsuccessful, and weight loss is often transitory. Id.

---

ignored provided the "verification" the ALJ found lacking. Thus, the omission leaves a substantial gap in the ALJ's reasoning. It is also true that, as the Commissioner notes, the ALJ is not required to believe plaintiff's daughters, but absent some discussion I cannot tell whether she disbelieved them or simply ignored their statements. See Zblewski v. Schweiker, 732 F.2d 75, 79 (7th Cir. 1984) (stating that unless the ALJ articulates reasons the reviewing court cannot tell if she rejected evidence or simply ignored it).

15

The SSA used to recognize obesity as a separate, Listed impairment, which if met resulted in a finding of disability. Cherry v. Barnhart, 327 F. Supp. 2d 1347, 1353 (N.D. Okla. 2004). The former obesity Listing included a Table establishing a threshold level of obesity based on a comparison of height and weight, and required an additional finding of unwellness such as pain and limitation of motion, hypertension, congestive heart failure, chronic venous insufficiency, or respiratory disease. See id. (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 9.09).

However, the SSA deleted the obesity Listing effective October 25, 1999, based on a determination that the criteria in the Listing did not represent a degree of functional limitation that would prevent an individual from working. SSR 02-1p at 1; see also Cherry, 327 F. Supp. 2d at 1353-54 (citing Revised Medical Criteria for Determination of Disability, Endocrine System and Related Criteria, 64 Fed. Reg. 46122, 1999 WL 637689 (Aug. 24, 1999) (codified at 20 C.F.R. pt. 404, subpt. P, app. 1)). But this does not mean that ALJs need no longer consider the effects of obesity during the sequential evaluation process. The SSA has provided that obesity can still constitute a severe impairment, "equal" (or in combination with other impairments "meet") a Listing, and impact on the claimant's RFC. See Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (noting that SSR 02-1p "requires an ALJ to consider the effects of obesity at several points in the five-step process"); Boston v. Barnhart, 332 F. Supp. 2d 879, 885-86 (D. Md. 2004) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2002) ("Section I.00Q of the Listing of Impairments provides that 'when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual

16

functional capacity, adjudicators must consider any additional and cumulative effects of obesity.'"); Brown v. Barnhart, 325 F. Supp. 2d 1265 , 1271-72 (N.D. Ala. 2004) (noting that after obesity Listing was deleted, changes were made to the Listings to ensure obesity was still addressed; for instance, paragraphs were added providing guidance about the potential effects of obesity in causing or contributing to impairments in the musculoskeletal, respiratory, and cardiovascular body systems).

At step two, the ALJ must first decide whether the claimant's obesity constitutes a medically determinable impairment. Ordinarily, this is accomplished based on a diagnosis of obesity by a treating source or consultative examiner. SSR 02-1p at 3. Absent such a diagnosis, the ALJ may rely on records showing consistently high body weight or body mass index ("BMI").[10] The ALJ must next determine whether the impairment is severe, i.e. whether it significantly limits the claimant's ability to do basic work activities. Id. at 4 (citing SSR 85-28 & 96-3p). "There is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment. Neither do descriptive terms for levels of obesity (e.g., 'severe,' 'extreme,' or 'morbid' obesity) establish whether obesity is or is not a 'severe' impairment for disability program purposes." Id. Rather, the ALJ must "do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." Id.

At step three, despite the fact that obesity no longer has a separate Listing, the ALJ may still determine that an individual with obesity "meets" or "equals" a Listed impairment. The ALJ may find that an obese claimant "meets" a Listing when she has another

---

[10]BMI is the ratio of the person's weight in kilograms to the square of her height in meters. Id. at 2.

impairment which, in combination with obesity, meets the requirements of a Listing.  For example, obesity may increase the severity of certain Listed impairments, such as those involving the musculoskeletal, respiratory, and cardiovascular systems, and is also listed as an aggravating factor in the Listings for certain mental impairments.  Id. at 5; see Sienkiewicz v. Barnhart, 409 F.3d 798, 802 (7th Cir. 2005) (discussing potential increase in severity under Listings for musculoskeletal and pulmonary disorders based on obesity).  The ALJ may also find that obesity, by itself, is medically equivalent to a Listed impairment if, for example, it results in an inability to ambulate effectively such that it substitutes for a "major dysfunction" of a joint.  Id. at 5.

Finally, if the claimant does not meet or equal a Listing, the ALJ must in determining her RFC consider any limitation in function caused by obesity.  The SSA recognizes that obesity may limit the person's exertional abilities (e.g., sitting, standing, walking, lifting, carrying, pushing, and pulling), ability to perform postural functions (e.g., climbing, balancing, stooping, and crouching), and ability to work on a regular and continuing basis.  Id. at 6.  "The combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."  SSR 02-1p at 6; see Barrett v. Barnhart, 355 F.3d 1065, 1068 (7th Cir. 2004) ("Even if Barrett's arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both."); see also Gentle v. Barnhart, No. 05-1089, 2005 U.S. App. LEXIS 26638, at *6-7 (7th Cir. Dec.

18

7, 2005) (noting potential effect of obesity on ability of person with disc disease to sit and stand).

### 2. Analysis

The ALJ addressed plaintiff's obesity as follows:

> The records made some reference to the fact that claimant is obese. At the hearing claimant testified that she currently weighed 285 pounds, having gained 60 pounds in the last year and stands 66 inches in height. The records suggest the claimant can be fairly mobile when she chooses to be with no evidence of any significant compromise of the musculoskeletal, cardiovascular, peripheral vascular and pulmonary systems (Exhibits 3E, 7E-8E, 1F, 3F-4F, 9F). The undersigned believes that the primary limitation relating to such would be claimant's tolerance for prolonged standing and walking.

(Tr. at 16.) The ALJ listed obesity along with plaintiff's other "severe" impairments, but concluded that she did not have an impairment or combination of impairments that met or equaled a Listing. (Tr. at 18, 19 #3.) She then set plaintiff's RFC at the "light" level, i.e. lifting and carrying 10 pounds frequently and 20 pounds maximum, and standing/walking and sitting for six hours in an eight hour workday. She added additional non-exertional limitations of no climbing, kneeling or crawling, and only occasional stooping, crouching and balancing. (Tr. at 18.) Based on that RFC and relying on the VE, the ALJ concluded that there were a significant number of jobs plaintiff could perform: attendant/monitor (3500 jobs), inspection (1200 jobs), and packager (1000 jobs). (Tr. at 19; 314.)

Noting that she met the old Listing for obesity, plaintiff first argues that the ALJ erred in failing to consider whether her obesity, in conjunction with her other impairments, equaled a Listing for a musculoskeletal or mental impairment under current law. However, the ALJ found that plaintiff's obesity did not significantly compromise her musculoskeletal, cardiovascular, peripheral vascular and pulmonary systems (Tr. at 16), and that plaintiff's

19

combined impairments did not meet or equal a Listing (Tr. at 19 #3). Plaintiff points to no errors in the ALJ's analysis of these issues; nor does she contend that such findings were unsupported by substantial evidence.

Further, plaintiff does not identify the specific Listing she believes she meets. SSR 86-8 provides:

> Where an individual has a combination of impairments, none of which meets or equals a listed impairment, and each impairment is manifested by a set of symptoms and relevant signs and/or abnormal laboratory findings, the collective medical findings of the combined impairments must be matched to the specific set of symptoms, signs, and laboratory findings of the listed impairment to which they can be most closely related. The mere accumulation of a number of impairments will not establish medical equivalency.

Absent identification of the specific Listing and some demonstration that the criteria are met, plaintiff's vague contention that her impairments in combination equal a Listing fails. Indeed, plaintiff's counsel conceded at the administrative level that plaintiff's impairments did not meet or equal a Listed impairment. (Tr. at 211.) Plaintiff argues that the ALJ should have obtained an updated medical judgment on equivalence because she submitted additional records after the consultants had issued their reports. However, I cannot conclude that the ALJ committed reversible error by failing to do so because, by failing to point to any potentially applicable Listing, plaintiff has not shown that there is any reasonable likelihood of a different result on remand. See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989).

Plaintiff also argues that the ALJ failed to account for the effects of her obesity in setting RFC and questioning the VE. As noted, the ALJ found that "the primary limitation relating to [obesity] would be claimant's tolerance for prolonged standing and walking." (Tr.

20

at 16.)  However, the ALJ then found that plaintiff could meet the exertional requirements of light work, which requires "a good deal of walking and standing – the primary difference between sedentary and most light jobs."  SSR 83-10.  She did not account for any limitation on plaintiff's ability to ambulate in the RFC; nor did she reconcile the conflict between the finding as to the limiting effect of plaintiff's weight on her ability to stand/walk and the RFC for light work.  <u>See</u> <u>Wates v. Barnhart</u>, 274 F. Supp. 2d 1024, 1034-35 (E.D. Wis. 2003) (reversing where ALJ's opinion was internally inconsistent).  She also failed to question the VE regarding the effects of limitations on standing/walking.

I cannot conclude that this error was harmless.  If plaintiff – a person "closely approaching advanced age" (50-54 years old) with a high school education and no transferable work skills – is limited to sedentary work, <u>see</u> SSR 83-10, she will be found disabled under the Grid, <u>see</u> 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.12.[11]  When a claimant is considered "disabled" under the Grid based on exertional limitations alone, the inquiry ends, regardless of any testimony from the VE theorizing jobs the claimant could do.  <u>See</u> <u>Fast v. Barnhart</u>, 397 F.3d 468, 471 (7th Cir. 2005) (citing <u>Swenson v. Sullivan</u>, 876 F.2d 683, 688-89 (9th Cir. 1989)); <u>see also</u> SSR 83-14 ("Where a person's residual functional capacity (RFC), age, education, and work experience coincide with the criteria of an exertionally based rule in Table No. 1, 2, or 3 – and that rule directs a conclusion of

---

[11]The record contains discrepancies as to how far plaintiff went in school.  (<u>Compare</u> Tr. at 85 <u>with</u> Tr. at 156.)  The ALJ found that plaintiff was a high school graduate.  (Tr. at 19 #7.)  However, under the Grid, whether plaintiff is a high school graduate or has a more "limited education" she would be disabled under Grid Rules 201.12 and 201.09 if limited to sedentary work.

'Disabled' – there is no need to consider the additional effects of a nonexertional impairment since consideration of it would add nothing to the fact of disability.").

If plaintiff's RFC falls somewhere between sedentary and light, the ALJ must follow the procedures set forth in SSR 83-12.  See Schwabe v. Barnhart, 338 F. Supp. 2d 941, 954 (E.D. Wis. 2004).  SSR 83-12 provides:

> If the exertional level falls between two rules which direct opposite conclusions, i.e., "Not disabled" at the higher exertional level and "Disabled" at the lower exertional level, consider as follows:
>
>> a. An exertional capacity that is only slightly reduced in terms of the regulatory criteria could indicate a sufficient remaining occupational base to satisfy the minimal requirements for a finding of "Not disabled."
>>
>> b. On the other hand, if the exertional capacity is significantly reduced in terms of the regularity definition, it could indicate little more than the occupational base for the lower rule and could justify finding of "Disabled."
>>
>> c. In situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability. Accordingly, VS assistance is advisable for these types of cases.

SSR 83-12.  In the present case, I cannot conclude that the ALJ adequately considered the effect of plaintiff's obesity and difficulty ambulating on the light occupational base. Despite her finding that plaintiff's obesity would affect her ability to remain on her feet for a prolonged period of time, she found that plaintiff could stand and/or walk for six hours out of an eight hour day.  These findings appear to be irreconcilable.

The Commissioner notes that the ALJ asked the VE about the effect of a requirement that the person be able to alternate positions between sitting and standing if

needed. The VE replied that the attendant/monitor positions could not be done, the inspection jobs would be reduced to 700, and the packager jobs reduced to 600. (Tr. at 314.) The Commissioner contends that this is still a significant number of jobs. However, these jobs are still at the light level, and the ALJ did not ask (and the VE did not testify) about the total amount of time the person would have to be on his or her feet during the course of the work day on these jobs. Therefore, I cannot conclude that the error was harmless, and the matter must be remanded for re-evaluation of the effects of plaintiff's obesity.[12]

## C.    ALJ's Finding That Plaintiff's Depression Was Not "Severe"

### 1.    Legal Standard

An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). "[A]n impairment(s) that is 'not severe' must be a slight abnormality . . . that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p.

"Basic work activities" are "the abilities and aptitudes necessary to do most jobs," including:

---

[12]Plaintiff also contends that ALJ erred by failing to factor into the RFC and to question the VE about her use of a cane, and neglected to follow SSR 96-9p, which addresses the use of "medically required hand-held assistive device[s]." The ALJ discussed plaintiff's request for a prescription for a cane (Tr. at 15) and her testimony about her use of a cane (Tr. at 17), noting that plaintiff "can be fairly mobile when she chooses to be" (Tr. at 16) and that "the clinical findings do not suggest significant and persistent disorganization of motor functions in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait, or retinitis proliferans or instances of acidosis." (Tr. at 17.) On remand, the ALJ should reconsider this issue as well after evaluating plaintiff's testimony and the effects of her obesity on her ability to walk/stand.

23

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

At step two, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on the claimant's ability to do basic work activities. SSR 85-28. "The vocational factors of age, education, and work experience are not considered[.]" SSR 96-3p. The regulations provide that great care should be exercised in applying the "not severe" impairment concept, and the process should not end unless the adjudicator is able to clearly determine the effect of an impairment or combination of impairments on the individual's ability to do basic work activities. Lopez-Navarro, 207 F. Supp. 2d at 880-81 (citing SSR 85-28); see also SSR 96-3p ("[I]f . . . the adjudicator is unable to determine clearly the effect of an impairment(s) on the individual's ability to do basic work activities, the adjudicator must continue to follow the sequential evaluation process until a determination or decision about disability can be reached."). Finally, if the ALJ finds that some impairments are severe and others not, she must, when determining RFC, consider the impact of all impairments, severe or not. SSR 96-8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'")

**2. Analysis**

In the present case, the ALJ found:

As far as restrictions with regard to the depressive disorder are concerned, claimant has at most, mild difficulties with activities of daily living, social functioning, and concentration, persistence, or pace and no episodes of decompensation of extended duration. She has not received psychiatric treatment. She is seen by a family practice physician and takes Paxil to relieve her symptoms of depression. The depression is not found to be a severe impairment since it has only a slight impact on the claimant's functioning.

(Tr. at 16.)

Plaintiff argues that the ALJ's conclusion was contrary to the reports of the SSA consultants. For instance, Dr. Nunchuck found that plaintiff appeared "depressed" and was "tearful at times throughout the interview." (Tr. at 157.) Plaintiff further notes that the consultants who reviewed the record found moderate limitations in various work-related abilities. (Tr. at 188-89.) She contends that by ignoring these opinions that ALJ impermissibly "played doctor," see Rohan, 98 F.3d at 970, and violated SSR 96-6p (stating that ALJ must explain weight given to state-agency consultant opinions).

The ALJ's step two determination on plaintiff's depression was contrary to the medical evidence. Dr. Nunchuck diagnosed plaintiff with "major depression, single episode, non-psychotic, moderate." (Tr. at 158.) The state agency consultants likewise found that plaintiff had a severe mental impairment, major depression, and recommended an RFC assessment. (Tr. at 192, 195.) The ALJ noted these opinions (Tr. at 16, 18) but failed to explain the weight she gave them or why she reached a contrary conclusion. Thus, her step two determination was error. See Lopez v. Barnhart, 336 F.3d 535, 540 (7th Cir. 2003) (stating that ALJ may not substitute her own judgment for a physician's opinion without relying on other medical evidence or authority in the record).

25

However, the Commissioner contends that because the ALJ found other severe impairments and continued with the sequential evaluation process there was no reversible error. Plaintiff states that the case the Commissioner cites on this point, <u>Maziarz v. Sec'y of Health & Human Servs.</u>, 837 F.2d 240 (6th Cir. 1987), is not binding and relied upon older regulations regarding a physical impairment. But SSR 98-6p recognizes that in assessing RFC the ALJ must consider all mental and physical impairments, severe or not. Thus, if the ALJ fulfills this obligation at step four, any error at step two will likely be harmless. <u>See</u> <u>Keys v. Barnhart</u>, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error doctrine in social security case); <u>cf.</u> <u>Samuel</u>, 295 F. Supp. 2d at 953-54 (reversing where ALJ erred in finding mental impairment not severe at step two <u>and</u> omitted any mental limitations from RFC at step four). Thus, the question becomes whether the ALJ's error at step two affected the RFC determination and thus the outcome of the case.

In setting RFC, the ALJ limited plaintiff to "unskilled work" (Tr. at 18), while the consultants' RFC was for "simple, routine work" (Tr. at 190). The Commissioner contends that the two are compatible. According to SSR 96-9p:

> The mental activities required by competitive, remunerative, unskilled work include:
>
> Understanding, remembering, and carrying out simple instructions.
>
> Making judgments that are commensurate with the functions of unskilled work – i.e., simple work-related decisions.
>
> Responding appropriately to supervision, co-workers and usual work situations.
>
> Dealing with changes in a routine work setting.

26

The consultants found that plaintiff was moderately limited in her ability to understand and carry out detailed instructions (Tr. at 188), which unskilled work would not require. However, they also found that she was moderately limited in her ability to work in coordination with or proximity to others without being distracted by them, complete a normal workday without interruptions from psychological symptoms, interact appropriately with the general public, respond appropriately to supervisors, and respond appropriately to changes in a work setting. (Tr. at 188-89.) These abilities are essential to unskilled work.[13]

> SSR 96-9p provides:
>
> A less than substantial loss of ability to perform any of the above basic work activities may or may not significantly erode the unskilled . . . occupational base. The individual's remaining capacities must be assessed and a judgment made as to their effects on the unskilled occupational base considering the other vocational factors of age, education, and work experience. When an individual has been found to have a limited ability in one or more of these basic work activities, it may be useful to consult a vocational resource.

In the present case, the ALJ asked the VE about an individual who could perform "simple, routine, repetitive work."[14] (Tr. at 313.) This matched the consultants' RFC. (Tr. at 190.) Thus, it would be tempting to say that the ALJ's decision was free of harmful error, despite

---

[13]The Commissioner, citing POMS DI 24510.060B4, notes that section I of the report, which contained the limitations discussed in the text, does not constitute the RFC assessment; rather, section III records the mental RFC determination. However, this cannot mean that the ALJ is free to ignore the information contained in section I, particularly where the findings in section I may give meaning to a nebulous statement in section III. Moreover, RFC is a decision for the Commissioner, not a doctor, and must be based on the entire record. Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

[14]This restriction was included in the VE's answer upon which the ALJ relied in denying the claim. (Tr. at 313-14; 18-19.)

27

her finding of no severe mental impairment.  However, it is unclear whether the jobs identified by the VE involved significant contact with co-workers or the public, and whether plaintiff could handle such contacts.  Further, the ALJ failed to properly evaluated plaintiff's testimony and her daughters' questionnaires, which touched upon her ability to interact with others.  Given this uncertainty, and because the matter must be remanded anyway, I will also remand for further proceedings on the issue.[15]

### D.    Nurse Practitioner Walker's Report

#### 1.    Legal Standard

Opinions from the claimant's treating physician (a/k/a "treating source") are entitled to special consideration in social security cases.  <u>Dominguese v. Massanari</u>, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001).  If the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence the ALJ must afford it "controlling weight."  20 C.F.R. § 404.1527(d)(2).  Even if the ALJ finds that the treating source opinion is not entitled to controlling weight, she may not simply reject it.  SSR 96-2p.  Rather, she must evaluate the opinion's weight by looking at the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors."  20 C.F.R. § 404.1527(d).  "Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always 'give good reasons' for her decision."  <u>Wates</u>, 274 F.

---

[15]"While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim."  SSR 96-8p.

Supp. 2d at 1034 (quoting 20 C.F.R. § 404.1527(d)(2)).  Finally, in some instances the ALJ may be required to re-contact the treating source if the report contains insufficient information for the ALJ to determine whether the claimant is disabled.  20 C.F.R. § 404.1512(e); SSR 96-5p.

However, in order to be considered a "treating source" the person must be a "physician, psychologist, or other acceptable medical source."  20 C.F.R. 404.1502. Certain medical personnel, such as nurse practitioners, physician's assistants, and therapists are not "acceptable medical source[s]."  20 C.F.R. § 404.1513(a); <u>Shontos v. Barnhart</u>, 328 F.3d 418, 426 (8th Cir. 2003).  Rather, they are considered "other source[s]." 20 C.F.R. § 404.1513(d).  The ALJ "may" use evidence from "other sources" to evaluate the severity of the claimant's impairments and how they affect her ability to work, but she is not required to apply the stringent treating source rule in evaluating such opinions. <u>Koschnitzke v. Barnhart</u>, 293 F. Supp. 2d 943, 950 (E.D. Wis. 2003) (collecting cases). Nevertheless, such opinions should not be ignored, and the ALJ is always required to explain how the evidence leads to her conclusions and how she resolved evidentiary conflicts.  <u>Id.</u> (collecting cases).

### 2.    Analysis

The ALJ considered NP Walker's April 24, 2003 report but decided to give it "little weight."  (Tr. at 15.)  She noted that there were no treatment records regarding testing for abnormalities of the hands or containing complaints about the hands.  She also stated that the notes from Dr. Kolesari and Froedert Hospital did not support the RFC in the report, which was instead based on a summary of limitations reported by plaintiff.

29

At best, th[e] evidence demonstrates that claimant's impairments may have improved and worsened over time but nevertheless can be controlled by medication and therefore cannot be considered disabling. Therefore, despite Ms. Walker's opinion that claimant cannot work an 8-hour workday, there is substantial evidence presented in the record supporting the undersigned's decision to give the April 24, 2003 checklist from Ms. Walker little weight.

(Tr. at 15.)

Plaintiff argues that the ALJ erred in evaluating Walker's "treating source statement." (R. 10 at 14.) However, as a nurse practitioner, Walker was not a "treating source." Instead, she qualified as an "other source," and I cannot conclude that the ALJ erred in analyzing her report. The ALJ properly compared the report to the other medical evidence in the record and came to a reasonable conclusion. Plaintiff points to no medical evidence substantiating either the limitations on grasping and fine manipulation with the right hand or the RFC assessment contained in Walker's report. She notes that the record contains a diagnosis of arthritis. However, this had nothing to do with plaintiff's hands but rather her spine; nor does the record suggest any limitations based on arthritis. (Tr. at 221, 240.)

Plaintiff contends that if the ALJ had questions about Walker's statement, she should have re-contacted plaintiff's doctor to ask for additional information. She points to a statement from Dr. Kolesari, first submitted to the Appeals Council, which states that plaintiff had chronic right arm pain and weakness secondary to cervical arthritis.[16] (Tr. at 253.) The argument fails. While the Commissioner's regulations require the ALJ to re-

---

[16]As noted above, because this statement was not before the ALJ, I may not consider it in evaluating her decision. See Rice, 384 F.3d at 366 n.2; Eads v. Sec'y of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993). Nor does plaintiff seek a remand under § 405(g), sentence six, which allows the court to remand for consideration of "new" and "material" evidence. See Jens, 347 F.3d at 214.

contact a "treating source" in some circumstances, Walker was not a treating source, and plaintiff points to no requirement that an "other source" be re-contacted. Nor does she demonstrate that the ALJ had a duty to contact Dr. Kolesari. The applicable regulation states:

> We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

20 C.F.R. § 404.1512(e). Because Dr. Kolesari did not provide a treating source statement, there were no conflicts or ambiguities to resolve. Further, courts have held that ALJs have a duty to re-contact a treating source or consult a medical expert only when the record is inadequate to determine whether the claimant is disabled. Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004). Courts must generally respect the ALJ's reasoned judgment as to how much evidence to gather. Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993). Plaintiff has not shown that the ALJ failed in her duty to develop the record here, where the transcript already contained the reports of several consultants and plaintiff's complete treatment records. Finally, because plaintiff was represented by counsel at the hearing the ALJ was "entitled to presume that [she had] made [her] best case." Sears v. Bowen, 840 F.2d 394, 402 (7th Cir. 1988) (citing Glenn v. Sec'y of Health & Human Servs., 814 F.2d 387, 391 (7th Cir. 1987)). Therefore, I find no error in the ALJ's evaluation of NP Walker's report.

31

### IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED** and this matter is **REMANDED** for further proceedings consistent with this decision, pursuant to § 405(g), sentence four.

Dated at Milwaukee, Wisconsin, this 20th day of December, 2005.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge